**HORIZON/CMS HEALTHCARE CORPORATION d/b/a Heritage Western Hills Nursing Home, Appellant,**

v.

**Lexa AULD, Administratrix of The Estate of Martha Hary, Deceased, Appellee.**

**Lexa Auld, Administratrix of The Estate of Martha Hary, Deceased, Appellant,**

v.

**Horizon/CMS Healthcare Corporation d/b/a Heritage Western Hills Nursing Home, Appellee.**

No. 2–98–083–CV

Court of Appeals of Texas, Fort Worth.

Jan. 8, 1999.

R. Brent Cooper, Michelle E. Robberson, Diana L. Faust, Cooper & Scully, Dallas, for appellant.

H. Dustin Fillmore, III, Charles W. Fillmore, The Fillmore Law Firm. P.C., H. Dustin Fillmore, III, Fort Worth, for Lexa Auld.

Before DAUPHINOT, RICHARDS, and HOLMAN, JJ.

## OPINION

DIXON W. HOLMAN, Justice.

We withdraw our opinion and judgment of January 7, 1999, and substitute the following. The opinion contains no substantive changes affecting the result and is only substituted to correct typographical errors.

This survival action began as a personal injury suit brought for Martha Hary as plaintiff by her next friend, Francis Orr. They sued for damages proximately caused by the negligence and gross negligence of Heritage Western Hills Nursing Home, where Martha was a bedridden patient from August 1994 until August 1995. Martha Hary died while the suit was pending, and Lexa Auld, administratrix of Martha's estate, took the case forward as a survival action that was tried to a jury. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 71.021 (Vernon 1996). The jury found that Martha's estate should recover actual damages and exemplary damages. The nursing home and Lexa Auld each appeal from the judgment, so each party is an appellant and an appellee. *See* TEX.R.APP. P. 3.1(a), (c), 38. Finding no reversible error, we affirm.

## Background

In August 1994, Martha Hary, age 76, became a resident at the nursing home. The case was tried upon allegations that beginning in December 1994, the nursing home neglected to provide Martha with medical care and treatment within the acceptable standard of care for the conditions of her health, including Alzheimer's disease, anxiety, malnutrition, emphysema, degenerative joint disease, spinal arthritis, arteriosclerosis, and incontinence. At trial, Auld asserted that while a resident at the nursing home between mid-December 1994 and August 1995, and because of substandard nursing care, Martha's body developed pressure sores, some of which deteriorated to a condition described as Stage IV, where the tissue overlying a person's bone rots away and leaves the bone exposed. Auld asserted that Martha suffered contractures in all extremities and that the nursing home did not provide Martha all of the wound care treatments and pressure relieving devices that had been ordered. Auld contended that the care administered for Martha's pressure sores was painful, including surgical excision of foreign matter and all dead and devitalized tissue in the wounds, a procedure known as debridement. On August 6, 1995, Martha was taken from the nursing home to Fort Worth's Osteopathic Hospital where she was treated for 10 days. After her discharge from the hospital, Martha spent the remaining year of her life at a facility that is not a party to this suit. She died August 9, 1996, from an apparent

heart attack, with recent gastrointestinal bleeding as a contributing factor.

## Jury Verdict

When the cause of action arose, the nursing home was owned and operated by defendant Horizon/CMS Healthcare Corporation, and the court's charge treated Horizon and the nursing home as one. The jury found that the nursing home's negligence proximately caused Martha's injury and found $2,371,000 as actual damages. That sum includes $1,750,000 for physical pain and mental anguish, $150,000 for disfigurement, $250,000 for impairment, and $221,000 for medical care. The jury did not find that Martha's injuries resulted from malice, but found the nursing home grossly negligent. The issue of damages for gross negligence was bifurcated. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.009 (Vernon 1995). The jury found $90,000,000 as exemplary damages.

## Damages Capped by Trial Court

In the final judgment, the trial court reduced the actual and exemplary damages. Persuaded that the nursing home is a "health care provider" and that the suit is a "health care liability claim," as defined in article 4590i,[1] the court applied the statute's $500,000 cap to the amount of actual damages found by the jury and reduced that to $1,541,203.13 after using the consumer price index to adjust the actual damages. *See* TEX.REV.CIV. STAT. ANN. art. 4590i, §§ 11.02(a), 11.04 (Vernon Supp.1999). Prejudgment interest on the capped actual dam-

ages of $1,541,203.13 at the rate of 10% per annum was granted for the period from July 31, 1996, to the date of judgment (December 29, 1997). That totaled $211,968.21.

The court also determined that although the exemplary damages were not subject to article 4590i's cap, they were subject to the 1994 version of a statutory cap for personal injury suits, which provided that "exemplary damages awarded against a defendant may not exceed four times the amount of actual damages or $200,000, whichever is greater." Former TEX. CIV. PRAC. & REM.CODE ANN. § 41.007.[2] For the final judgment, the court applied the section 41.007 cap to reduce the $90,000,000 exemplary damages to $9,483,766.92. To compute the reduction, the court multiplied by four the jury's *uncapped* actual damages award of $2,370,941.71.[3]

## The Nursing Home's Issues

The nursing home appeals only these issues: (1) whether in a survival suit pled as a "health care liability claim" against a "health care provider," terms defined in article 4590i, the statute's $500,000 limitation on "civil liability for damages" restricts only the amount of compensatory damages the claimant may recover, or whether the cap also limits the prejudgment interest and the exemplary damages the claimant may recover; (2) whether written reports by the state about its investigations and reviews of the nursing home were erroneously admitted as evidence over the nursing home's objections that the reports were inadmissible either because of Texas Human Resources Code section

---

1. *See* Medical Liability and Insurance Improvement Act, TEX.REV.CIV. STAT. ANN. art. 4590i (Vernon Supp.1999).

2. *See* Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, 1987 Tex. Gen. Laws 37, 46, *amended* by Act of April 11, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 111 (current version at TEX. CIV. PRAC. & REM.CODE ANN. § 41.008 (Vernon 1997)).

3. Counsel explained in the oral submission of this appeal that, although the jury found exactly $2,371,000 in actual damages, the parties consented to let the trial court deduct $58.29 from that sum in order to conform the amount of the jury's actual damages award to the evidence admitted at trial. The corrected sum is $2,370,941.71, which the trial court then reduced by

applying the cap of article 4590i, section 11.02(a) to the elements of actual damages except the medical expenses. The court then applied the consumer price index (CPI) to adjust that amount as allowed by section 11.04. The trial court determined that the amount of lawfully allowable actual damages, capped and then adjusted by the CPI, is $1,541,203.13. To reduce the jury's $90,000,000 exemplary damages finding under the 1994 version of section 41.007 of the civil practice and remedies code, the trial court quadrupled the jury's *uncapped* finding of actual damages ($2,371,941.71 corrected). Although *de minimis*, we notice that four times $2,370,941.71=$9,483,766.84, not the $9,483,766.92 figure recited in the judgment.

32.021, or, alternatively, because the reports were irrelevant, prejudicial, or hearsay; and (3) whether the evidence was legally sufficient and factually sufficient to support the jury's findings that the nursing home's negligence and gross negligence caused Martha's personal injuries or to support the jury's findings of damages for physical pain and mental anguish, disfigurement, and impairment; and even if it is assumed that the nursing home's conduct was the proximate cause of those injuries, the damages awarded are excessive. The nursing home does not complain that either the jury finding of $90,-000,000 in punitive damages or the court's reduction of that sum to $9,483,766.92 is excessive.

The nursing home presents alternatives for its relief on appeal. The first alternative is that if our review determines that with admissible evidence Auld established the nursing home's liability for proximately causing Martha's injuries and if our review determines that the nursing home is not entitled upon lawful grounds to a new trial, then the home asks that we reverse the trial court's judgment and render judgment that the provisions of article 4590i, sections 11.02 and 11.04, cap the nursing home's total liability at $1,541,203.13. The nursing home's second alternative asks that we reverse the trial court judgment and render judgment that the nursing home is liable for no prejudgment interest and only $1,541,203.13 in actual damages plus four times that amount in exemplary damages.

### Article 4590i's Cap

■ We begin our consideration of the nursing home's first issue with the language that creates the cap in article 4590i, section 11.02:

(a) In an action on a health care liability claim where final judgment is rendered against a physician or health care provider, the limit of civil liability for *damages* of the physician or health care provider shall be limited to an amount not to exceed $500,-000.

(b) Subsection (a) of this section does not apply to the amount of *damages* awarded on a health care liability claim for the expenses of necessary medical, hospital, and custodial care received before judgment or required in the future for treatment of the injury.

TEX.REV.CIV. STAT. ANN. art. 4590i, § 11.02 (Vernon Supp.1999) (emphasis added).

Relying on those two subsections, the nursing home insists that although a health care claimant is entitled to recover the actual amount of his or her necessary medical, hospital, and custodial care expenses, the recovery of any other types of damages (other actuals, prejudgment interest, exemplary damages) is limited to an aggregate sum of $500,000. The nursing home argues that because the category of medical, hospital, and custodial care expenses is the single category of compensatory damages that the statute's cap *expressly excludes,* then a reasonable conclusion is that the statute's cap *inherently includes* every other category of damages, and thus limits the estate's recovery of both prejudgment interest and exemplary damages. Auld responds that article 4590i's cap is not applicable to prejudgment interest or exemplary damages.

■ Our goal and standard of review when construing a statute is to give effect to the legislature's intent expressed in the statute. *See* TEX. GOV'T CODE ANN. § 312.005 (Vernon 1998); *Sorokolit v. Rhodes,* 889 S.W.2d 239, 241 (Tex.1994). And, when construing statutory language that is unambiguous, we must look to the plain and common meaning of those words for the legislature's intent. *See Sorokolit,* 889 S.W.2d at 241. When a word is not connected with and used with reference to a particular trade or subject matter, or is not used as a word of art, then we should not attribute such characteristics to it. *See* TEX. GOV'T CODE ANN. § 312.002 (Vernon 1998). Here, the monetary sum that is capped by the language of section 11.02 in article 4590i is described only by the word "damages." Because that word is not defined in the statute, we must determine whether the word "damages," as used there, means only *compensatory* damages, or whether the word also includes the prejudgment interest as well as exemplary or punitive damages that may be awarded in a "health care liability claim."

In a case involving another statute that permits the recovery of "damages" without defining that word, the Texas Supreme Court did not construe "damages" as a special word of art or expertise, but instead relied on WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 323 (1989) to ascertain the ordinary meaning of the word. *See Geters v. Eagle Ins. Co.,* 834 S.W.2d 49, 50 (Tex.1992). In *Geters,* the subject statute authorized recovery against a motor vehicle dealer's surety bond by a person who, in an underlying suit, "obtains a judgment against [the] dealer ... assessing damages." *Id.*Although hypothetically an underlying suit and judgment against a motor vehicle dealer could end with a judgment for both compensatory and exemplary damages, the Texas Supreme Court in *Geters* attributed the dictionary's ordinary meaning to the word "damages" as it was used in the context of that statute: *"compensation in money imposed by law for loss or injury." Id.* (emphasis added).

Significantly, the Texas Supreme Court has long adhered to the principle that the purpose of *exemplary* or *punitive* damages is to protect society by punishing an offender, *not to compensate* the injured party. *See Hammerly Oaks, Inc. v. Edwards,* 958 S.W.2d 387, 391 (Tex.1997). The distinction is illustrated by another dictionary's definition of the term "compensatory damages" as: "damages awarded to make good or compensate for an injury sustained—distinguished from *punitive damages."* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 463 (1981) (emphasis in original text).

Moreover, when article 4590i was enacted, the legislature included the language of section 1.02(a), which stated that a "medical malpractice insurance crisis" then existed in Texas and "has had a material adverse effect on the delivery of medical and health care" in the state. TEX.REV.CIV. STAT. ANN. art. 4590i, § 1.02(a)(5), (6). Section 1.02(a)(13) states that "these facts" and others "have been verified by the Medical Professional Liability Study Commission, which was created by the 64th Legislature. For further amplification of these facts the legislature adopts the findings of the report of the commission." That commission was also known as "The Keeton Commission" because it was chaired by Page Keeton, and a copy of its report is included in the appendix to Auld's appellee brief.

Within the commission's report is a discussion of the "damages" resulting from the type of litigation that had created the "crisis" the commission was studying. The only damages discussed were compensatory, not punitive:

6. *Damages*

In general those who suffer personal injury as a consequence of the negligence of another can recover two kinds of damages: first, damages for non-economic losses that go by the name of physical pain and mental suffering; second, economic losses, such as expenses and loss of earnings. The Study Commission has for convenience lumped damages into three categories: (1) pain and suffering, (2) expenses, and (3) loss of earnings.... They are of just as much importance with respect to settlements as they are with respect to claims that are pursued to a court judgment.

*See* TEXAS MEDICAL PROFESSIONAL LIABILITY STUDY COMM., 65th LEG., FINAL REPORT 5 (1976). We conclude that the legislature incorporated the report's findings into section 1.02(a)(13) so the statute would contain an understandable expression of what the legislature intended to accomplish by enacting article 4590i. None of the report's recommendations about the litigation process or tort laws mention punitive damages, and Auld argues persuasively that the commission intentionally omitted all references to punitive damages from its discussion of tort litigation "damages."

In contrast, where the report addressed insurance matters, not litigation or tort laws, the commission recommended that medical malpractice insurance policies should not insure health care providers or physicians against punitive damages. *See* PROFESSIONAL LIABILITY STUDY at 25. When the 65th Legislature enacted article 4590i, it also amended the Texas Insurance Code to prohibit medical professional liability insurance policies from insuring Texas health care providers and physicians for punitive damages assessed against them. *See* TEX. INS.CODE

ANN. art. 5.15–1, § 8 (Vernon Supp.1999). The nursing home suggests that the insurance code amendment means that when the legislature enacted article 4590i, its members knew that the "medical malpractice insurance crisis" included the possibility that juries and courts may assess punitive damages against health care providers and physicians in suits based on health care claims. Because the legislature was aware of that possibility, the nursing home maintains that the legislature enacted article 4590i, section 11.02, as an intentional cap on punitive damages.

■ That premise is not persuasive. We must presume that when the legislature enacted article 4590i, a just and reasonable result was intended. *See* TEX. GOV'T CODE ANN. § 311.021 (Vernon 1998). And, we must not construe article 4590i "to produce an absurd or foolish result if [the statute] is reasonably susceptible of an alternative construction." *See City of San Antonio v. Fourth Court of Appeals*, 820 S.W.2d 762, 768 (Tex.1991) (orig.proceeding). It would be illogical to couple a decision of the 65th Legislature that denies policyholders the ability to insure themselves against punitive damages (insurance code article 5.15–1, section 8), with another decision of the 65th Legislature (article 4590i, section 11.02) that, were we to accept the nursing home's premise, would shrink or effectively eliminate punitive damages by blending them with compensatory damages and capping the total.

■ After examining the legislative history presented to us by the parties to this suit, we are unable to find a sound reason in the record for presuming that the 65th Legislature intended to deny insurance against punitive damages, yet simultaneously meant to impose a capping statute that has the potential to cancel all of the punitive damages. For a court to construe the language of article 4590i's section 11.02 as imposing a cap on punitive damages would judicially improvise significant protection for any health care provider proven in a court of law to have injured a patient intentionally or by gross neglect. We are not persuaded that the

legislature intended that section 11.02 would be a mechanism for health care claim defendants to minimize or evade their uninsurable punitive consequences of injuring a patient intentionally or by gross neglect. Intentional injury and gross neglect cases are the ones that may result in punitive damages, but the legislative history of article 4590i compels the conclusion that those are not the types of damages that were the target of the legislature's concern when it enacted that statute. Instead, by enacting article 4590i, the legislature intended to place a cap only on the compensatory damages that result from ordinary negligence. The word "damages" as used in section 11.02 is unambiguous. It means only compensatory damages aside from the expenses of necessary medical, hospital, and custodial care received before judgment.

■ Turning our attention to the prejudgment interest allowed in this case on the compensatory damages, we note that at trial the nursing home conceded that the computation was governed by the 1994 version of the prejudgment interest statute. That statute includes the provision that "[a] judgment in a wrongful death, personal injury, or property damage case *must* include prejudgment interest." TEX.REV.CIV. STAT. ANN. art. 5069–1.05, § 6(a) (Vernon 1994)[4] (emphasis added). Despite conceding that here the prejudgment interest must be computed under that statute, the nursing home insists that because of article 4590i, section 11.02(a), the dollar amount of prejudgment interest must be added to the compensatory damages and the total of the two must be reduced by article 4590i's cap. We do not agree. Applying the rationale the nursing home advocates would effectively prevent the recovery of prejudgment interest in this case and would produce a result contrary to the prejudgment interest statute which makes that type interest mandatory. *See Tunstill v. Scott*, 138 Tex. 425, 160 S.W.2d 65, 70 (1942). The nursing home's rationale also suggests an irreconcilable conflict between the mandatory prejudgment interest statute and the cap of article 4590i. When two statutes irreconcilably conflict, the stat-

---

4. Now codified in TEX. FIN.CODE ANN. § 304.102 (Vernon 1998).

ute last enacted prevails. *See* TEX. GOV'T CODE ANN. § 311.025(a) (Vernon 1998). Article 4590i was enacted in 1977. Even if we were to accept the nursing home's rationale, the resulting irreconcilable conflict of the two statutes would mean that the prejudgment interest statute would prevail because it was enacted in 1987, and article 4590i's cap would not apply to the prejudgment interest awarded in this case. *See id.*

We perceive no irreconcilable conflict between article 4590i's provisions and the 1994 version of the prejudgment interest statute, article 5069–1.05, section 6(a). By enacting the prejudgment interest statute several years after enacting article 4590i, the legislature erased any logic from a theory that article 4590i caps prejudgment interest. Because section 11.02(a) of article 4590i neither caps prejudgment interest nor exemplary damages in the suits to which the statute applies, we overrule the nursing home's first issue.

When we consider Auld's appeal from the trial court judgment, we will address her assertion that the Texas Supreme Court has held unconstitutional the application of section 11.02(a)'s damages cap to a suit like this, which seeks recovery on a common law personal injury claim. *See Rose v. Doctors Hosp.*, 801 S.W.2d 841, 845 (Tex.1990); *Lucas v. United States*, 757 S.W.2d 687, 687 (Tex.1988).

### The Reports as Evidence

The nursing home's second issue asserts that it was harmed because the trial court admitted into evidence written investigation reports that should have been excluded. In this case, the reports were created by state investigators from the Texas Department of Human Services known as "surveyors" who inspect nursing homes to determine whether there is compliance with state licensing requirements and federal and state Medicaid requirements. *See* TEX. HEALTH & SAFETY CODE ANN. § 242.037(8) (Vernon 1992); 42 C.F.R. §§ 483.1, et seq. (1995). The nursing home argues that the survey reports merely measure the extent of the home's compliance with contractual and regulatory standards, not whether it has negligently deviated from the standard of medical care necessary for patients.

After the defense rested its case, a hearing was held out of the jury's presence where Auld offered as rebuttal evidence thirteen state "survey reports" labeled exhibit 22, pages A through M, covering the period from September 1, 1994 to December 31, 1995. For most of that time, Martha resided at the home. Auld's exhibit list identifies exhibit 22 as "certified copies of Texas Department of Human Services, Long Term Care Records, Vendor 498–51, Heritage Western Hills Nursing Home." The nursing home objected to all of the exhibit's pages on grounds that they are irrelevant and not offered by a sponsoring witness. The nursing home objected to other pages as hearsay and not admissible as public agency records under the hearsay exception of evidence rule 803(8); that they are vague and misleading, with a prejudicial impact that outweighs their probative value; that they are complaint reports, not surveys; that they are offered for their truth about the ultimate issues in the case; that they are conclusory; that they do not pertain to standard of care; that allowing the jury to view them as evidence creates an unfair comment from the court on the standard of care; and that they are not admissible under Texas Human Resources Code section 32.021(i).

Auld counters that exhibits 22A through M were admissible because: (1) they were neither offered nor admitted to prove the nursing home's violation of standards necessary for participation in the state Medicare program; (2) they are admissible under Human Resources Code section 32.021(j)(3)(A) and (B); (3) they were offered both for impeachment and to show the nursing home's timely knowledge of Martha's condition; (4) the nursing home failed to preserve any relevancy complaint about the exhibits; (5) the trial court correctly ruled that the exhibits were not excluded by the hearsay rule; and (6) not only did the trial court properly rule that the exhibits' probative value outweighed any potential prejudice to the nursing home, the record does not confirm the home's contention that the trial court failed to conduct the

balancing test of evidence rule 403 when making that ruling.

When an appellant seeks reversal of a judgment based upon the admission or exclusion of evidence, the standard of review requires us to examine the entire record to determine whether the whole case turned on the evidence that is complained about. *See* TEX.R.APP. P. 44.1(a); *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex.1989). To obtain reversal, the appellant must show that the trial court evidentiary ruling was, in fact, erroneous, and that the error was reasonably calculated to cause and probably did cause rendition of an improper judgment. *See* TEX.R.APP. P. 44.1(a). In other words, the appellant must show that the whole case turned on the evidentiary ruling. *See City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753–54 (Tex.1995).

Initially, we note that when considering the probative nature of evidence versus its possible prejudicial effect, we may presume that the trial court conducted a rule 403 balancing test, which need not be announced for the record. *Cf. Stern v. State*, 922 S.W.2d 282, 287 (Tex.App.—Fort Worth 1996, pet. ref'd); *Blondett v. State*, 921 S.W.2d 469, 474 (Tex.App.—Houston [14th Dist.] 1996, pet. ref'd); *Nolen v. State*, 872 S.W.2d 807, 812 (Tex.App.—Fort Worth 1994, pet. ref'd). Here, the record contains a lengthy discussion and consideration of exhibit 22 by both court and counsel. We conclude that the court conducted the balancing test required by rule 403.

When a trial court admits evidence that is admissible as to one party or for one purpose but not admissible as to another party or for another purpose, then the court, if requested, must restrict the evidence to its proper scope and instruct the jury accordingly. *See* TEX.R. EVID. 105(a). If there is no request, the admission of that evidence without limitation affords no ground for complaint on appeal. *See id.* Here, because the nursing home did not request a limitation or any limiting instruction to the jury when Auld offered exhibit 22, the trial court admitted it for all purposes, and the nursing home waived any complaint to the exhibit's general admission. *See id.; Birchfield v. Texarkana*

*Mem'l Hosp.*, 747 S.W.2d 361, 365 (Tex.1987). As a result of that waiver, we need determine only whether the exhibit was relevant to any material issue before the trial court. *See Rendleman v. Clarke*, 909 S.W.2d 56, 58 (Tex.App.—Houston [14th Dist.] 1995, writ dism'd).

Both the opening statement to the jury by the nursing home's attorney, and the eventual testimony of the nursing home's witnesses about a good quality of care given to Martha, opened the door to the admission of exhibit 22 and the use of its contents as impeachment material. The trial court observed:

> Well, your witnesses have testified that no patient ever failed to have the basic care. So, if there is an incident [recorded within exhibit 22] showing that a patient failed to have basic care, it is at least impeachment if it goes to the issues that are the basis of this case.

In its opening statement, the nursing home attorney told the jury that because the nursing home has "a system for not forgetting anybody ... you have to believe that they didn't do it [care for] Ms. Hary, or that they did it for no one." Nursing home witness Posthauer told the jury that if Martha had not received proper care, state authorities would have cited the home for a deficiency, but she testified that she had not reviewed the pertinent state survey records. Nursing home witness Shannon told the jury that, like the state surveyors do, she had made a surprise visit to the home and found it "decent" and saw no "people who looked like they weren't being reasonably cared for." Although she mentioned the survey records to the jury, she testified that she had not seen them. Other testimony for the nursing home was that its patients were always cared for and that if the home had truly lacked the staff to attend to the patients' needs, the state's representatives "would have been in there right away" to issue citations.

Because exhibit 22 is (and was presented to the trial court as) a certified copy of a record of a public agency, it is not inadmissible hearsay. *See* TEX.R. EVID. 803(8); *Sensitive Care, Inc. v. Texas Dep't of*

*Human Servs.,* 926 S.W.2d 823, 826 (Tex. App.—Austin 1996, no writ). Moreover, evidence of a defendant's subjective knowledge of the peril his conduct creates is admissible to prove gross negligence, which was an issue at this trial. *See Birchfield,* 747 S.W.2d at 365. The information contained in exhibit 22 confirms the nursing home's knowledge of the conditions in the home that adversely affected Martha's care and showed that the state did bring those conditions to the home's knowledge in a timely manner with regard to Martha's stay at the home.

■■■ One of the nursing home's objections to exhibit 22 was based on Texas Human Resources Code section 32.021(i), which provided in part:

(i) Except as provided by Subsections (j) ... a ... complaint investigation, incident investigation, or survey report that documents that an institution has violated a standard for participation in the state Medicare program ... is not admissible as evidence in a civil action to prove that the institution has committed a violation.

TEX. HUM. RES.CODE ANN. § 32.021(i) (Vernon Supp.1999). Significantly, Auld did not offer exhibit 22 to prove that the nursing home had violated a standard for participation in the state Medicare program. And, on September 1, 1997, the following amendment of subsection (j) took effect, specifically addressing subsection (i):

(j) Subsection (i) does not:

. . . .

(3) bar the admission into evidence in a civil action of a written finding, survey report, complaint investigation, incident investigation, or inspection report of the department that is offered:

(A) to establish warning or notice to an institution of a relevant finding; or

(B) under any rule or evidentiary predicate of the Texas Rules of Evidence.

TEX. HUM. RES.CODE ANN. § 32.021(j)(3)(A), (B) (Vernon 1990). The nursing home insists that although the September 1, 1997 amendment of subsection (j) appears to make exhibit 22 admissible, the amendment does not apply here because this suit was filed before the amendment's effective date. We do not agree. The amendment of subsection (j) is not substantive law, but is a procedural legislative enactment that addresses the admission of evidence at a civil trial. It therefore governs lawsuits that are pending on the effective date of the amendment. *See Ex parte Abell,* 613 S.W.2d 255, 260 (Tex.1981); *Exxon Corp. v. Brecheen,* 526 S.W.2d 519, 525 (Tex.1975).

Once the exhibit was admitted, the nursing home called no witnesses to deny or explain the information reported in the exhibit. Having carefully examined the entire record, we conclude that the trial court did not abuse its discretion by admitting exhibit 22. We overrule the nursing home's second issue.

### Excessive Damages Issue

■■■ The nursing home's third and final issue contests both the legal and factual sufficiency of the evidence supporting the jury's findings of damages by asserting that the findings of damages for physical pain and mental anguish, disfigurement, and impairment are excessive. In determining a challenge to the legal sufficiency, the standard of review requires that we consider all of the evidence in the light most favorable to the party in whose favor the verdict has been rendered and indulge every reasonable inference from the evidence in that party's favor. *See Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex.1998); *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1799, 140 L.Ed.2d 939 (1998); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951). If there is more than a scintilla of such evidence to support the fact finding, the claim is sufficient as a matter of law, and any challenges go merely to the weight to be accorded the evidence. *See Formosa Plastics Corp.,* 960 S.W.2d at 48; *Leitch v. Hornsby,* 935 S.W.2d 114, 118 (Tex.1996). A challenge to the legal sufficiency of the evidence may only be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital

fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *See Merrell Dow Pharms.*, 953 S.W.2d at 711 (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L.Rev. 361, 362–63 (1960)). There is some evidence when the proof supplies a reasonable basis on which reasonable minds may reach different conclusions about the existence of the vital fact. *See Orozco v. Sander*, 824 S.W.2d 555, 556 (Tex.1992).

The standard of review of a challenge to the factual sufficiency of the evidence requires that we consider all of the evidence in the case and determine whether the evidence of the challenged fact findings is so weak, or the evidence to the contrary so overwhelming, that the jury's findings should be set aside and a new trial ordered. *See Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex.1998); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). The standard of review for determining whether damages are excessive requires that we examine all of the evidence to determine whether sufficient evidence supports the damages award, then remand the case or remit the damages only if the evidence is so factually insufficient or the jury's finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. *See Pope v. Moore*, 711 S.W.2d 622, 624 (Tex. 1986).

A plaintiff is not entitled to recover damages for injuries without producing evidence from which the jury may reasonably infer that the defendant's conduct caused the injuries. *See Haynes & Boone v. Bowser Bouldin, Ltd.*, 896 S.W.2d 179, 182 (Tex. 1995). The instructions in the court's original charge in this case made clear that the jury must not find and assess a sum of money as Martha's compensatory damages unless the jury first found that the nursing home's negligence was a proximate cause of her injury. The court's supplemental charge in the bifurcated portion of the trial made clear that the jury must not find and assess a sum of money as exemplary damages unless the jury first found that the negligent acts of

the nursing home constituted "gross negligence." The supplemental charge defined that term as more than momentary thoughtlessness, inadvertence, or error of judgment, but rather, such an entire want of care as to establish that the act or omission in question was the result of actual conscious indifference to Martha's rights, welfare, or safety. Because the nursing home's brief contains no issue, argument, or authority challenging the jury's findings that the nursing home's negligence and gross negligence proximately caused Martha's injuries, nor does the nursing home's brief challenge the jury's finding of the amount of fair and reasonable compensation for Martha's medical care, those findings bind both the parties and this court. *See* Tex.R.App. P. 38.1(e).

Our review of all the evidence reveals that at trial, Auld established that (1) four basic nursing interventions were necessary to prevent Martha from developing pressure sores and contractures on her body; (2) the first intervention required that Martha be turned and repositioned regularly; (3) the second intervention required that Martha receive adequate nutrition; (4) the third intervention required that, as an incontinent patient, Martha's skin be kept clean and dry; (5) the fourth intervention required that to stimulate blood flow to the skin and prevent contractures, Martha's joints should have been treated with a passive range of motion exercises; (6) in the beginning of Martha's stay at the nursing home, she received those types of care which kept pressure sores and contractures from developing on her body; (7) from mid-December 1994 until she was taken from the nursing home on August 6, 1995, Martha did not receive those types of nursing care; (8) during the latter time-period, Martha's body was not turned or repositioned during approximately 210 eight-hour shifts, totaling 1,680 hours; (9) that during the same period of months, Martha was not fed regularly and missed 238 meals; (10) that during the same period of months, Martha was not given incontinent care during approximately 216 eight-hour shifts, totaling 1,728 hours; (11) during that period of months, no range of motion exercises were administered to Martha; (12) the nursing

home's current and past employees admitted that its records (flow sheets) for Martha accurately reflected these deficiencies, and they testified that they had no reason to doubt the records' accuracy; (13) that between mid-December 1994 and August 1995, Martha's body developed between nine and 12 pressure sores, at least four of which deteriorated to Stage IV, and she also developed contractures in all of her extremities; (14) after Martha developed the pressure sores, the nursing home did not furnish all of the wound-care treatments and pressure-relieving devices that were ordered for her; (15) those conditions resulted in painful wound care and debridement; (16) when she was taken from the nursing home to the hospital, the hospital personnel considered her condition to be terminal due to the pressure sores, contractures, infection, and malnutrition; (17) that those conditions caused her to have to undergo painful treatments at the hospital; and (18) the injuries she suffered while at the nursing home caused her severe physical pain, mental anguish, physical impairment, and physical disfigurement, which lasted until her death nearly a year after she left the nursing home. Auld carried her burden to prove and secure jury findings that the nursing home proximately caused Martha's injuries.

After examining all of the evidence, we conclude that the jury's fact findings are not so weak, nor is the evidence to the contrary so overwhelming, that a new trial should be ordered. The evidence is both legally and factually sufficient to support the jury's findings of damages for physical pain and mental anguish, disfigurement, and impairment. We overrule the nursing home's third issue.

### Auld's Issues

Auld's appeal contends that in its final judgment, the trial court erred by applying the provisions of section 11.02(a), article 4590i, to reduce the amount of compensatory damages the jury assessed for Martha's personal injuries. And, Auld argues that the judgment erroneously applies civil practice and remedies code section 41.007 to reduce the amount of exemplary damages the jury assessed. Although we list Auld's issues in a

different sequence than she uses in her brief, the specific issues are: (1) whether in a survival claim for personal injuries caused by medical malpractice, the $500,000 cap prescribed by article 4590i, section 11.02(a) is void because the Texas Supreme Court has already held that section an unconstitutional violation of the open courts provision of the Texas Constitution (see TEX. CONST. art. I, § 13; *Lucas v. United States*, 757 S.W.2d 687 (Tex.1988)); and (2) regardless of the constitutional issue, whether the nursing home waived any right to benefit from the article 4590i section 11.02(a) cap, because the home did not prove or obtain a jury finding that it was a "health care provider," as defined in section 1.03(a)(3) of that article; and (3) whether the nursing home waived any right to benefit from section 41.007's cap because its trial pleading (first amended original answer) did not plead that the home intended to invoke that statute's cap.

Auld asks that we reform the judgment to allow Martha's estate to recover the $2,370,-941.71 actual damages the jury assessed (as conformed to the evidence with the parties' consent), plus $326,085.68 prejudgment interest on that amount, plus $87,000,000 in exemplary damages.

### Auld's Appeal Timely

 The nursing home challenges Auld's right to appeal by contending that Auld did not timely file a notice of appeal and that she never preserved her issues for appeal by filing any motions challenging error in the trial court's judgment. See TEX.R.APP. P. 25.1, 33.1(a). Our initial concern before addressing Auld's issues is whether she complied with the Texas Rules of Appellate Procedure by timely filing her notice of appeal. She did.

An appeal is perfected when a written notice of appeal is filed with the trial court clerk. See TEX.R.APP. P. 25.1(a). Every party desiring to alter the trial court's judgment must file a notice of appeal. See TEX.R.APP. P. 25.1(c). Normally, a notice of appeal must be filed within 30 days after the judgment is signed. See TEX.R.APP. P. 26.1. In this case, the judgment was signed on December 27, 1997. After that date, the nursing home

timely filed its motion to modify, correct, and/or reform the judgment. As a matter of law, that filing extended the time for filing a notice of appeal until 90 days after the judgment was signed. *See* TEX.R.APP. P. 26.1(a)(2). The nursing home timely filed its notice of appeal on March 30, 1998, which, as a matter of law, meant that if Auld also wished to appeal the judgment, she had to file her own notice of appeal no later than 14 days after March 30. *See* TEX.R.APP. P. 26.1(d). She complied by timely filing a notice of appeal on April 13, 1998.

## Issues Preserved

 The nursing home maintains that in the trial court Auld did not file motions challenging error in the trial court's judgment, and therefore, she failed to preserve any issues for her appeal. *See* TEX.R.APP. P. 33.1(a). To preserve the issues Auld asks us to review, she had to tender them in a timely manner to the trial court, on the record, by either a request, objection, or motion containing the grounds for the rulings she sought. *See id.* Also on the record, Auld had to obtain the trial court's ruling or refusal to rule on each issue that she asks us to review on appeal. *See id.* Although she did not plead the statute's unconstitutionality under rule 94, she took the necessary steps after the jury's verdict to preserve her issues for appeal. She tendered the issues to the trial court on the record, after verdict, when she filed her motion for judgment that contains the issues on which she now appeals, and a 33–page brief of law and arguments supporting that motion. She also preserved the issues by filing an eight-page letter-brief of law and arguments supporting her issues, by filing her motion to reconsider and modify the trial court's judgment, and also by filing her three-page letter-brief replying to the home's opposition to her issues.

With the combination of post-verdict motions and briefs in the trial court, Auld plainly asserted that it is unconstitutional to apply the provisions of section 11.02(a) to cap compensatory damages in this case; that the nursing home lost its right to claim the benefit of the damages cap of section 11.02(a) by not presenting evidence proving that the home was a statutorily-defined "health care provider"; and that by not pleading its right to have the benefit of section 41.007's cap on exemplary damages, the nursing home waived that affirmative defense. Not only did Auld's motions and briefs give the trial court the opportunity to consider her objections and issues, but the nursing home responded and opposed Auld's objections and issues in the trial court. Because Auld's positions on those issues were denied by the trial court on the record, her issues now are preserved for our review. *See Fredonia State Bank v. General Am. Life Ins. Co.,* 881 S.W.2d 279, 282 (Tex.1994).

## Auld's Constitutional Issue

 Auld's first issue (our sequence) declares that because the Texas Supreme Court has held section 11.02(a)'s cap on damages unconstitutional, the trial court erroneously applied that section's provisions to reduce the compensatory damages the jury awarded to Martha. The Texas Constitution provides that "[a]ll courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law." TEX. CONST. art. I, § 13. This so-called "open courts provision" ensures that Texas citizens bringing common law causes of action will not unreasonably be denied access to the courts. *See Sax v. Votteler,* 648 S.W.2d 661, 664 (Tex. 1983).

 The nursing home insists that because Auld went to trial without pleading section 11.02(a)'s unconstitutionality as an affirmative defense to the nursing home's claim of entitlement to invoke the cap of section 11.02(a), she waived that defense. The nursing home argues that because Auld's fourth amended original petition did not plead as an affirmative defense that the application of section 11.02(a) in this suit is unconstitutional, the issue of the statute's unconstitutionality was not before the trial court.

 A plaintiff or defendant who desires to rely on either an affirmative defense listed in the rules of civil procedure or upon any other matter that constitutes an avoidance of an opposing party's claim must plead that defense. *See* TEX.R. CIV. P. 94; *Sim-*

mons v. Compania Financiera Libano, S.A., 830 S.W.2d 789, 792 (Tex.App.—Houston [1 st Dist.] 1992, writ denied). An affirmative defense not pled or tried by consent is waived. See Tacon Mech. Contractors v. Grant Sheet Metal, Inc., 889 S.W.2d 666, 671 (Tex.App.—Houston [14 th Dist.] 1994, writ denied). Ordinarily, the unconstitutionality of a statute is an affirmative defense that must be pled. See, e.g., Knoll v. Neblett, 966 S.W.2d 622, 639 (Tex.App.—Houston [14 th Dist.] 1998, pet. denied); Scurlock Permian Corp. v. Brazos County, 869 S.W.2d 478, 483– 84 (Tex.App.—Houston [1 st Dist.] 1993, writ denied); Houston Chronicle Publ'g. Co. v. City of Houston, 531 S.W.2d 177, 183 (Tex. App.—Houston [14 th Dist.] 1975, writ ref'd n.r.e.).

The nursing home went to trial on its first amended answer that includes the affirmative defense that the home "affirmatively pleads and invokes the limitation(s) on civil liability set forth in section 11.01 et seq. of article 4590i." Auld went to trial on her fourth amended original petition that does not mention article 4590i or any of its sections, but nevertheless asserts a health care claim against a health care provider within the meaning and scope of that statute.

▉▉▉ The purpose of requiring a party to plead an affirmative defense is to give the opponent fair notice that the pleading party intends to claim the benefit of the defense. See Tex.R. Civ. P. 94; Petta v. Rivera, 923 S.W.2d 678, 686 (Tex.App.—Corpus Christi 1996, writ denied). Here, the nursing home's first amended original answer made clear that if the jury should find damages for Martha, and if those damages should exceed $500,000, the home would ask the trial court to reduce those damages by applying the provisions of section 11.01, et seq. of article 4590i. In determining whether issues are supported by pleadings, a trial court may supply omissions in the pleadings of one party by referring to the allegations contained in the pleadings of another. See Land Title Co. of Dallas, Inc. v. F.M. Stigler, Inc., 609 S.W.2d 754, 756 (Tex.1980). The nursing home's pleading alone placed the unconstitutionality issue before the trial court, because a trial court has no discretion to apply or enforce a statute that the supreme court has already held unconstitutional. As a matter of law, a jury will never be asked to determine whether a statute is unconstitutional. And, whether a defendant in a jury trial would ever be lawfully entitled to ask the court to impose the provisions of section 11.02(a) to reduce damages is hypothetical until and unless the trial ends with a jury's verdict that assesses damages that exceed $500,000. In this case, as soon as the hypothetical became a reality, Auld presented the trial court a written motion for judgment for uncapped compensatory damages and a written brief that presented the issue of law: whether applying the provisions of section 11.02(a) in this suit is unconstitutional.

The Texas Supreme Court has held that section 11.02(a) of article 4590i violates the constitution's open courts provision, reasoning that the section unreasonably and arbitrarily restricts an injured plaintiff's right to a due course of law remedy for injuries, as guaranteed by article I, section 13. See Lucas, 757 S.W.2d at 687. In its rationale, the Texas Supreme Court agreed with the Supreme Court of New Hampshire that "[i]t is simply unfair and unreasonable to impose the burden of supporting the medical care industry solely upon those persons who are most severely injured and therefore most in need of compensation." Id. at 692 (quoting from Carson v. Maurer, 120 N.H. 925, 424 A.2d 825, 837 (1980)).

▉▉▉ This suit began in 1996 while Martha was alive, for the purpose of prosecuting her common law claims for her personal injuries. The suit was filed long after 1988 when the Texas Supreme Court determined that applying section 11.02(a)'s cap on damages in common law personal injury suits like Martha's is unconstitutional. See Lucas, 757 S.W.2d at 687. And, this suit began long after 1990 when that court approved that principle of law again and distinguished the holding of Lucas from the holding of Rose, a wrongful death suit. See Rose, 801 S.W.2d at 841. If Martha had been alive throughout the trial of her personal injury suit, there would have been no survival action on behalf of Martha's estate, and the holdings of Lucas and Rose would have prevented the nursing home from

·successfully invoking the damages cap of section 11.02(a).

Auld now argues that because the damages cap of section 11.02(a) is unconstitutional when applied to personal injury claims grounded in common law, Martha's compensatory damages for that type claim may not lawfully be capped in the survival action. Auld contends that we need only determine whether Martha's right to uncapped damages died with her or whether it survived to her estate. Auld concedes that at common law, Martha's claim would not have survived her death, *see Hofer v. Lavender*, 679 S.W.2d 470, 471 (Tex.1984), but Auld insists that Martha's personal injury suit is still viable within the survival statute:

(a) A cause of action for personal injury to the health, reputation, or person of an injured person does not abate because of the death of the injured person or because of the death of a person liable for the injury.

(b) A personal injury action survives to and in favor of the heirs, legal representatives, and estate of the injured person. The action survives against the liable person and the person's legal representatives.

(c) The suit may be instituted and prosecuted as if the liable person were alive.

TEX. CIV. PRAC. & REM.CODE ANN. § 71.021 (Vernon 1997).

After *Lucas*, the Texas Supreme Court considered the constitutionality of sections 11.02 and 11.03 of article 4590i when those damage-capping provisions were applied in a wrongful death suit, a cause of action created by statute. *See Rose*, 801 S.W.2d at 842. In *Rose*, the supreme court reasoned that although each may be a "health care liability claim" as defined by article 4590i, section 11.03(a)(4), a claim for common law personal injury is distinct from a statutory claim for wrongful death. *See id.* at 844–45. There, the court reconciled the *Lucas* and *Rose* opinions by holding in *Rose* that the damages caps of article 4590i are constitutional when applied to a statutory suit for wrongful death, but unconstitutional when applied to a common law suit for personal injury. *See id.*

The nursing home reminds us that although Martha's suit began as a common law personal injury claim, it became a statutory survival action upon Martha's death, and that the Texas Supreme Court has held that a survival plaintiff is not entitled to make an open courts challenge to the statute of limitations contained in article 4590i. *See Bala v. Maxwell*, 909 S.W.2d 889, 893 (Tex.1995). The nursing home argues that because of the supreme court's holding in *Bala*, the survival plaintiff in this suit is not entitled to make an open court challenge to the damages caps of article 4590i. We agree with that hypothesis. It is clear that but for the survival statute, Martha's common law personal injury cause of action would have perished at her death while her suit on that claim was pending. *See Bala*, 909 S.W.2d at 893; *Rose*, 801 S.W.2d at 845. Thus, Auld's survival action now on appeal is a remedy conferred by statute, not common law. *See* TEX. CIV. PRAC. & REM.CODE ANN.· § 71.021 (Vernon 1997).

After carefully examining the record, we conclude that the issue of section 11.02(a)'s unconstitutionality was before the trial court notwithstanding Auld's failure to plead statutory unconstitutionality as an affirmative defense in her fourth amended original petition. And, the open courts provision of the Texas Constitution did not forbid the trial court's reliance on section 11.02(a)'s cap of compensatory damages. The trial court did not err by applying that section's provisions to reduce from $2,370,941.71 to $1,541,203.13 the compensatory damages the jury found for Martha. We overrule Auld's first issue (our sequence).

## Judicial Admissions

 In connection with her second issue (our sequence), Auld maintains that the nursing home cannot be a beneficiary of section 11.02(a)'s cap on damages because the home failed to prove at trial that it is a health care provider within the meaning of article 4590i. The nursing home replies that because Auld's fourth amended petition alleged that Auld's suit is a "health care liability claim," and that Heritage is a "nursing home" and a "health care provider," terms defined in article 4590i, section 1.03(a), the courts should

treat those allegations as conclusively-established "judicial admissions" which relieved the nursing home of any burden to either plead its affirmative defense of entitlement to the article 4590i cap, or to prove that defense, or to ask for a jury finding on that defense. We agree. *See Mapco, Inc. v. Carter,* 817 S.W.2d 686, 687 (Tex.1991); *Chilton Ins. Co. v. Pate & Pate Enters., Inc.,* 930 S.W.2d 877, 884-86 (Tex.App.—San Antonio 1996, writ denied).

Moreover, Auld proved at trial that the appellee is a nursing home and a health care provider and that her cause of action is a health care liability claim. In effect, Auld's second issue asserts that even though she has pled and proved a cause of action, and has recovered judgment, for a "health care liability claim" against a "health care provider," under article 4590i, the courts should deny the defendant any standing under that statute. We overrule Auld's second issue.

## Section 41.007

If it is applicable here, the provisions of civil practice and remedies code section 41.007 as it existed before September 1, 1995, would cap the jury's finding on punitive damages. The nursing home's first amended original answer pled that the sections of chapter 41 of the civil practice and remedies code that are applicable to this suit are sections 41.003 (the standards for recovering punitive damages), 41.008 (a revised and renumbered version of the punitive-damages-capping statute that did not become effective until September 1, 1995, *after* Martha was discharged from the nursing home), and 41.009 (requiring bifurcated trial of the punitive damages issue). The home's amended answer did not mention section 41.007 (the version of the punitive-damages-capping statute in effect during the time Martha resided at the nursing home).

◼ In connection with her third and final issue (our sequence), Auld contends that because the nursing home did not plead as an affirmative defense that it expressly relied on the provisions of section 41.007, the nursing home waived the right to have the trial court use those provisions to reduce the jury's finding on punitive damages from $90,000,000 to $9,483,766.92.

◼ The nursing home maintains that because it has found no reported cases that have addressed the question of whether a defendant intending to rely on the capping provisions of section 41.007 must plead it as an affirmative defense, the home had no such duty. That assertion is unpersuasive. The cap on damages provided by article 4590i, section 11.02(a) is an affirmative defense that must be pled in a lawsuit that asserts a health care liability claim. *See Webster v. Johnson,* 737 S.W.2d 884, 889 (Tex.App.—Houston [1st Dist.] 1987, writ denied). A defendant who pleads the intent to rely at trial on a statutory cap of anticipated punitive damages is simply pleading a defensive theory by which the defendant will try to avoid a portion of the damages the plaintiff seeks. Parties have a duty to affirmatively plead defenses of avoidance. *See* TEX.R. CIV. P. 94; *Simmons,* 830 S.W.2d at 792. Moreover, the nursing home did plead the September 1, 1995 capping provision, section 41.008, as an affirmative defense. That plea gave fair notice to the trial court and to Auld that the home meant to use the damages-capping-section of Chapter 41 of the code as an avoidance defense.

◼ Despite having pled entitlement to the capping benefits of section 41.008, which does not apply to this suit, rather than pleading section 41.007, which does apply, the home contends that if article 4590i, section 11.02(a) does not cap punitive damages, then as a matter of law, the trial court had to apply the punitive damages capping formula of section 41.007 to reduce the jury's finding on punitive damages. We agree. Auld did not specially except to the nursing home's defensive plea that invoked section 41.008, which was a statutory damages cap not yet enacted into law at the time Martha's cause of action arose. When a party fails to specially except to an opponent's pleading, the courts will construe the pleading liberally in favor of the pleader. *See Boyles v. Kerr,* 855 S.W.2d 593, 601 (Tex.1993); *Roark v. Allen,* 633 S.W.2d 804, 809 (Tex.1982). Because a crucial part of every trial court's responsibility is to apply and enforce the law correctly,

we will presume that the trial court in this suit would not knowingly apply an ex post facto statutory damages cap (section 41.008) to the jury's finding of punitive damages, and we will presume that the trial court would not shun the interests of justice by allowing the nursing home's defensive plea to fail merely because it misidentified the statute by using its current number, 41.008, instead of its previous number, 41.007. *See* TEX.R. CIV. P. 71; *CKB & Assocs., Inc. v. Moore McCormack Petroleum, Inc.*, 809 S.W.2d 577, 585–86 (Tex.App.—Dallas 1991, writ denied). The nursing home's amended answer put the issue of a cap on punitive damages fairly before the court. *See CKB & Assocs., Inc.*, 809 S.W.2d at 585–86. It is apparent from the record that the trial court deemed the contents of the nursing home's first amended original answer as fair and adequate notice, to Auld and the court, that the home intended to invoke the protection of the only section in chapter 41 that provides a cap on punitive damages. We will presume that the trial court recognized that the only chapter 41 punitive damages capping section that was applicable to Martha's cause of action was section 41.007, in the text that existed before September 1, 1995. The trial court correctly applied those provisions of section 41.007 by quadrupling the jury's uncapped finding of $2,371,941.71 in actual damages. We overrule Auld's third issue (our sequence).

### Conclusion

We have carefully considered and overruled each of the nursing home's issues, because (1) article 4590i, section 11.02(a) does not impose a cap on prejudgment interest or punitive damages; (2) the trial court properly admitted Auld's exhibit 22 in evidence; and (3) the evidence was legally and factually sufficient to support the jury's findings that the nursing home's negligence and gross negligence proximately caused Martha's personal injuries, and the jury's findings of damages for physical pain and mental anguish, disfigurement, and impairment are not excessive.

After carefully considering the issues on which Auld appeals, we have overruled her first issue (our sequence): that the trial court erred by using that section's provisions to reduce the $2,370,941.71 compensatory damages the jury found for Martha. We have overruled Auld's second issue (our sequence) because her pleadings and evidence included judicial admissions that the nursing home is a health care provider entitled to the cap on damages provided in section 11.02(a). We have overruled her third issue (our sequence) because the nursing home's first amended original answer does not have the effect of waiving the home's entitlement to the benefit of the 1994 version of section 41.007 of the civil practice and remedies code that imposes a cap on punitive damages in a monetary sum equal to four times the actual damages found by the jury.

Finding no reversible error, we affirm the trial court's judgment. Because Lexa Auld, Administratrix, is the prevailing party in this appeal, we award her all of the appellate costs she has incurred. *See* TEX.R.APP. P. 43.4.