

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

**NO. 02-13-00191-CV**

KENT DAVIS AND D. KENT DAVIS, P.C.         APPELLANTS AND APPELLEES

V.

LEDFORD WHITE AND M & M JOINT VENTURE         APPELLEES AND APPELLANTS

----------

## FROM THE 96TH DISTRICT COURT OF TARRANT COUNTY
### TRIAL COURT NO. 096-257264-11

----------

## MEMORANDUM OPINION[1]

----------

This appeal involves the validity and amount of an exemplary damages award in a suit by one former law partner against another, arising from the failure to properly distribute a firm receivable. In three issues, Kent Davis and D. Kent Davis, P.C. challenge the trial court's allowing Ledford White and M & M Joint

---

[1]*See* Tex. R. App. P. 47.4.

Venture to amend their answer post-trial to plead the exemplary damages cap in section 41.008 of the civil practice and remedies code and the trial court's subsequent application of the cap to the jury's exemplary damages award. Tex. Civ. Prac. & Rem. Code Ann. § 41.008 (West Supp. 2014). In a cross-appeal, appellees challenge the sufficiency of the evidence to uphold the jury's finding that White's fraud caused Davis harm. We reverse the trial court's reduced award of exemplary damages and render judgment reinstating the jury's exemplary damages award of $2.8 million. We affirm the remainder of the judgment.

## Background

White and Davis were partners in a law firm (the Partnership) who had agreed to split profits equally. The Partnership operated a closing office for a title insurance company, prepared loan documents for a mortgage company, and represented individual clients.[2] One of White's primary clients was Alton Isbell, a real estate investor and developer.

White, who is board certified in real estate law, did not keep time records for any of his clients, including Isbell. Instead, White allowed Isbell to pay the Partnership what he could when he was able. Additionally, the Partnership received fees when Isbell's development entities closed on the sale or purchase of real property.

---

[2]White ran the title office, and Davis was primarily responsible for the loan document preparation for the mortgage company.

White and Isbell formed M & M Joint Venture on August 12, 2003 for the purpose of purchasing and owning a piece of real property in Crowley (the Crowley Tract). Each owned fifty percent of the joint venture, but both Isbell and White testified that White's ownership was held for the Partnership. Isbell had given the interest to the Partnership in payment for legal work that White had already completed. On August 13, 2003, Isbell signed a deed from one of his companies, Stone Gate Village, Inc., conveying the Crowley Tract to M & M. The conveyance did not reserve any part of the mineral estate. White did not tell Davis about M & M, but he testified that "the full intention was to split it with" Davis.

Also in August 2003, White and Isbell formed a partnership, Lucky IW, with the same 50/50 ownership, for the purpose of purchasing mineral interests. In contrast to his ownership of M & M, White considered his ownership interest in Lucky IW to be his own property. According to White, he did not pay anything for his interest in Lucky IW because Isbell wanted to take advantage of White's good credit. However, White testified that it was possible that Isbell also gave him at least part of the interest in Lucky IW to satisfy any debt to the Partnership that might have been left over after giving it the M & M interest, but there was no way to know.

When White and Isbell formed Lucky IW, the Barnett Shale development was not as widespread as it later became. White testified that he did not think he would get paid for any mineral interests in 2003 and that he was not even

thinking about mineral interests with respect to the Crowley Tract in 2003. Nevertheless, White testified at trial that at the time he received the interests in M & M and Lucky IW, he considered only the surface estate of the Crowley Tract to be a Partnership receivable. White also did not tell Davis about Lucky IW.

In March 2005, Isbell signed a mineral deed from another of his development companies, Deer Creek Estates, Inc., to Lucky IW, conveying all of the mineral estate in the Crowley Tract[3] but specifically reserving the right of ingress and egress on the surface for the purpose of oil and gas development. The County Clerk's registration page lists "White and Davis, LLP," at the Partnership's mailing address.

In 2006, when Davis asked White about what Isbell owed the Partnership, White told Davis: "I exchanged a receivable for an interest in this joint venture property over in Crowley, and they - - he can't sell the property unless I sign off on it, so we're taken care of." White told Davis that he had it covered and Davis did not need to worry about it. However, White did not tell Davis the name of the joint venture. They did not discuss the matter again until after the dissolution of the Partnership, which occurred in early 2007.[4]

---

[3]There is evidence that Deer Creek, rather than Stone Gate Villages, owned the Crowley Tract before the attempted conveyance to M & M, but the status of M & M's title is not relevant to the issues on appeal.

[4]The Partnership lost its mortgage document preparation business in early 2006; by summer, the Partnership's receipts were down sixty to seventy percent.

The evidence showed that in 2006 White deposited $98,228.31 attributable to M & M into the Partnership's real estate escrow account without telling Davis.[5] White could not explain what this money was for. White said that he did not give any of that money to Davis because he had no memory of depositing that money; he admitted, however, that if the money really had been paid to M & M, he should have reimbursed Davis his fifty percent.

By 2007 the Barnett Shale was "in big play, big-time" around the Crowley Tract. In March 2007, White, on behalf of M & M as the "surface owner," granted Chesapeake Operating, Inc. the use of the surface of three acres from the Crowley Tract for oil and gas operations. In April 2007, White, on behalf of M & M, and Isbell, on behalf of Stone Gate, signed a document entitled "Lease Ratification," in which M & M and Stone Gate ratified two oil and gas leases dated March 5, 2005 from Deer Creek to FSOC Gas Co., LTD; at least one of the leases appears to involve the Crowley Tract. In August 2007, Isbell, on behalf of M & M, signed a special warranty deed conveying five acres of the Crowley Tract to Chesapeake Exploration, L.L.C. The deed reserved "all oil, gas and other minerals" to M & M as the grantor. At the bottom of the first page of the deed is

---

[5]The evidence shows that M & M was paid money from various sources from the date of its creation; any proceeds from M & M were paid into the real estate escrow account or White's personal account. Although the real estate escrow account was a Partnership account that Davis knew about, it was not the firm's title or operating account; White was responsible for the majority of the transactions in the real estate escrow account, and Davis did not involve himself with the account at all.

5

the following: "After Recording Return To: White & Davis LLP," at the Partnership's address.

In September 2007, White prepared correction deeds—backdated to be effective March 5, 2005—conveying the Crowley Tract (plus a contiguous 2.545 acres) to M & M from Deer Creek Estates but reserving all of the mineral estate. By that time, the Crowley Tract, specifically the mineral estate, had increased significantly in value. White said that he prepared the correction deeds at Chesapeake Energy's request to clear problems with the title.

In 2008, White traded his fifty percent interest in Lucky IW for Isbell's fifty percent interest in M & M. According to White, Isbell needed to borrow money for a project, and the bank would not let him use Lucky IW's mineral interests as collateral unless Isbell owned one hundred percent of Lucky IW. After the trade, White owned one hundred percent of M & M and Isbell owned one hundred percent of Lucky IW. Shortly thereafter, Davis returned to the former Partnership's building to office, but he and White did not resume the Partnership.

On March 30, 2010, but effective April 1, 2010, White, on behalf of M & M, signed a conveyance of M & M's "right, title and interest in and to the mineral interests, royalty interests and/or overriding royalty interests" of the Crowley Tract to four different entities and one person, in varying percentages. The conveyance stated that it was M & M's "intention . . . to assign and sell all of its interests" in Tarrant County, Texas. The conveyance also included general warranty language.

Additionally, on April 1, 2010, White deposited $180,000 in his personal bank account, also without telling Davis. White also testified that the $180,000 was for the sale of Lucky IW's mineral rights and that it belonged to Isbell, but Isbell told White to keep all of the $180,000 because Deer Creek Estates was in bankruptcy and Isbell had personally guaranteed Deer Creek's debts. However, the date of this deposit corresponds with the date of the assignment of mineral and royalty interests to St. Andrews.

From 2006 to 2010, M & M also received the following, which White did not disclose to Davis or disburse him any proceeds: (1) $20,000 from the surface agreement with Chesapeake; (2) $581,000, along with Deer Creek, from Chesapeake for the two lease ratifications; and (3) royalties from the leases on the Crowley Tract and other tracts, of which M & M's share totaled approximately $160,616.81 (September 2008 through June 2010).[6] M & M also received $152,000 from the City of Crowley for the sale of about two and one-half acres of the Crowley Tract, but White applied the majority of that money to the payment of back taxes on that small part of the Crowley Tract and on the building that the Partnership still owned.

In contrast, White paid Davis $50,000 from the sale of five acres of the Crowley Tract to Chesapeake in August 2007.

---

[6]White contended that the royalties should have been paid to Lucky IW and that he and Isbell could never get Chesapeake to tell them why it continued to pay royalties to M & M instead of Lucky IW.

7

Sometime around spring 2010, Davis again asked White about the Crowley Tract, and White told him that "we" were "still trying to sell it" but that "nothing's going on" and things were still "sluggish." Davis believed he had no reason to doubt what White was telling him. Also in 2010, Davis became concerned about the extent of activity related to the mineral estate of the Crowley Tract after talking to a former client of White's, Mike Parks. Eventually, after receiving numerous calls from Parks telling Davis to look into the situation, Davis asked White about the mineral rights to the Crowley Tract; White told Davis that the minerals were not part of the Partnership's deal. At that time, Davis still trusted White.

Davis finally learned the name of the joint venture when reading Isbell's deposition in Deer Creek's bankruptcy proceeding. Davis did not find out that White owned and controlled one hundred percent of M & M until 2011 when Parks and White had a heated argument in White's office, during which White confirmed his ownership of M & M.

In December 2011, Davis sued White and M & M claiming breach of fiduciary duty and fraud; he sought actual and exemplary damages, the imposition of a constructive trust on the Crowley Tract, and an accounting. A jury found that White had breached his fiduciary duty to Davis and had committed fraud, awarding appellants actual damages of $374,672.56 and exemplary damages of $2.8 million. The jury also found that Davis was entitled to a fifty percent interest in M & M.

8

Appellants moved for judgment on the jury's verdict. In their motion, appellants contended that the exemplary damages award should not be subject to the cap in section 41.008 because appellees had waived application of the cap by failing to plead it as an affirmative defense. Appellees responded by arguing that the cap in section 41.008 is not an affirmative defense that must be pleaded; however, they also filed a post-trial motion seeking an amendment of their answer to add the statutory cap. The trial court allowed appellees to amend their answer.

The trial court signed a judgment awarding appellants actual damages of $282,084.82, after the application of a stipulated offset. The trial court also applied the statutory cap to the exemplary damages award, limiting it to $564,169.64. Finally, the trial court imposed a constructive trust on an undivided fifty percent of M & M and its assets.

### Issues on Appeal

In three issues, appellants contend that the trial court should not have allowed appellees to amend their answer to plead section 41.008 as an affirmative defense and should not have applied the section 41.008 exemplary damages cap as a matter of law. In their cross-appeal, appellees challenge the sufficiency of the evidence to support the jury's finding that, for purposes of awarding exemplary damages, Davis's harm resulted from White's fraud. Because a determination in appellees' favor would be dispositive of appellants' appeal, we will review the cross-appeal first.

9

**Sufficiency of the Evidence to Support Fraud Causation Finding**

Appellees contend that there is no clear and convincing evidence to support the jury's finding that the harm to Davis was caused by White's fraud.[7] *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a) (West Supp. 2014).

**Preservation of Issue**

Appellants contend that appellees failed to preserve this issue[8] for appeal by failing to file a post-trial motion raising this issue or by making only a general objection at trial.

A no-evidence issue is preserved for appeal by (1) a motion for instructed verdict, (2) a motion for judgment notwithstanding the verdict, (3) an objection to the submission of the issue to the jury, (4) a motion to disregard the jury's answer to a vital fact issue, or (5) a motion for new trial. *Cecil v. Smith,* 804 S.W.2d 509, 510–11 (Tex. 1991). Appellees did not raise this issue in a post-trial motion, but they objected to the submission of Question Number 6 in the jury charge on the grounds of "no evidence, or legally insufficient evidence, to warrant the submission of th[e] issue." Question Number 6 stated, "Do you find by clear and

---

[7]Appellees do not challenge the sufficiency of the evidence to support the jury's fraud finding with respect to the actual damages awarded because they concede that the actual damages are recoverable on appellants' breach of fiduciary duty claim. Here, the same evidence that supports the jury's actual fraud finding would support its decision to award exemplary damages, as long as the evidence meets the elevated "clear and convincing" standard. *See Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 621–22, 627 (Tex. 2004).

[8]Appellees' broad challenge to the fraud finding is presented in three issues.

convincing evidence that harm to Davis resulted from fraud as defined in Question No. 2?" Question Number 2 stated,

> Fraud occurs when —
>
> a. a party makes a material misrepresentation, and
>
> b. the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion, and
>
> c. the misrepresentation is made with the intention that it should be acted on by the other party, and
>
> d. the other party relies on the misrepresentation and thereby suffers injury.
>
> "Misrepresentation" means:
>
> a. a false statement of fact,
>
> OR WHEN —
>
> b. a fiduciary fails to disclose a material fact within the knowledge of that fiduciary, and
>
> c. the fiduciary knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth, and
>
> [d.] the fiduciary intends to induce the other party to take some action by failing to disclose the fact.

Appellants argue that appellees did not preserve the issue because

> [f]raud in this case was submitted as either traditional fraud or fraud by non-disclosure when there was a fiduciary duty to disclose. Under fraud by failure to disclose, reliance and causation are submitted differently, and may be satisfied by showing simply that the injured party suffered damages as a result of acting without knowledge of the undisclosed fact. . . .

11

. . . .

Nothing about White's objections specified which option he believed the evidence to be legally insufficient to support. . . .

. . . Nothing about White's objections to Questions 2 and 6 apprised the trial court of the nature of this objection.

Appellants thus contend that because Question Number 6 refers back to Question Number 2, and because Question Number 2 references two different types of fraud, appellees failed to apprise the trial court which type of fraud should not be submitted for lack of sufficient evidence.

Generally, a no-evidence objection directed to a single jury issue is sufficient to preserve error without further detail. *Arkoma Basin Exploration Co. v. FMF Assocs. 1990-A, Ltd.*, 249 S.W.3d 380, 387 (Tex. 2008). Like all other procedural rules, those regarding the specificity of post-trial objections should be construed liberally so that the right to appeal is not lost unnecessarily. *Id.* at 388.

Appellants' argument is premised on their interpretation of whether causation must be shown in fraud by nondisclosure; they contend that it does not, but appellees contend it does. This issue was not raised or disputed at trial and is not necessary to the resolution of this appeal. Appellees clearly objected to the submission of either type of fraud with respect to both actual and exemplary damages on the grounds that there was insufficient evidence to support either type of fraud (all of Question Number 2) and that any fraud by White caused harm to Davis (Question Number 6). We do not think these general objections failed to make the trial court aware of the nature of appellees'

12

objections. Thus, we conclude and hold that appellees' general sufficiency objection to Question Number 6 preserved their complaint on appeal regarding the sufficiency of the evidence to show causation. *See, e.g.*, *Majeed v. Hussain*, No. 03-08-00679-CV, 2010 WL 4137472, at *6 (Tex. App.—Austin Oct. 22, 2010, no pet.) (mem. op.).

**Standard of Review**

Clear and convincing evidence is that measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. Tex. Civ. Prac. & Rem. Code Ann. § 41.001(2) (West 2008); Tex. Fam. Code Ann. § 101.007 (West 2014); *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 137 (Tex. 2012); *State v. K.E.W.*, 315 S.W.3d 16, 20 (Tex. 2010). This intermediate standard of proof falls between the preponderance standard of proof applicable to most civil proceedings and the reasonable doubt standard of proof applicable to most criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979). While the proof must be of a heavier weight than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed. *Addington*, 588 S.W.2d at 570.

In evaluating the evidence for legal sufficiency, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that its finding was true. *K.E.W.*, 315 S.W.3d at 20; *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 248 (Tex. 2008), *cert.*

13

*denied*, 290 S.W.3d 873 (2009).  We review all the evidence in the light most favorable to the finding.  *Waldrip*, 380 S.W.3d at 138; *Hogue*, 271 S.W.3d at 248. We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so.  *K.E.W.*, 315 S.W.3d at 20; *Hogue*, 271 S.W.3d at 248.  We disregard all evidence that a reasonable factfinder could have disbelieved. *Hogue*, 271 S.W.3d at 248.  We consider undisputed evidence even if it is contrary to the finding.  *Id.*; *City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005).  That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not.  *See K.E.W.*, 315 S.W.3d at 20; *Hogue*, 271 S.W.3d at 248. The factfinder, not this court, is the sole judge of the credibility and demeanor of the witnesses.  *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

**Applicable Law**

Under section 41.003 of the civil practice and remedies code, exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the exemplary damages are sought resulted from fraud, malice, or gross negligence.  Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a).  For purposes of section 41.003, fraud does not include constructive fraud.[9]  *Id.* § 41.001(6) (West 2008).  Additionally, a plaintiff's burden

---

[9]"Constructive fraud is the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests."  *Kohannim v. Katoli*, 440 S.W.3d 798, 810 (Tex. App.—El Paso 2013, pet. denied),

14

to prove such fraud, malice, or gross negligence may not be met with evidence of ordinary negligence, bad faith, or a deceptive trade practice. *Id.* § 41.003(b).

The evidence must show that the defendant's acts or omissions were a cause-in-fact of the plaintiff's injury, i.e., a substantial factor in bringing about an injury which otherwise would not have occurred. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors Inc.*, 960 S.W.2d 41, 47 (Tex. 1998) (op. on reh'g). Like common-law fraud, fraud by nondisclosure includes the elements of justifiable reliance and damage. *BP Am. Prod. Co. v. Zaffirini*, 419 S.W.3d 485, 506 (Tex. App.—San Antonio 2013, pets. denied); *Horizon Shipbuilding, Inc. v. BLyn II Holding, LLC*, 324 S.W.3d 840, 850 (Tex. App.—Houston [14th Dist.] 2010, no pet.).

**Analysis**

The evidence shows that Davis trusted White and relied on him to collect and distribute receivables attributable to work done for Isbell, as well as White's other clients. Instead of naming the Partnership as the other owner of M & M with Isbell, White named himself. White did not give Davis any information that would have allowed Davis to discover the owner of the property, and he knew that Davis could not have done so. Not only did White not tell Davis about the Partnership's interest in M & M when asked by Davis, he referenced it only

*disapproved of on other grounds by Ritchie v. Rupe*, 443 S.W.3d 856, 870–71 & n.17 (Tex. 2014). Thus, to prove entitlement to exemplary damages under section 41.003, a plaintiff must show causation. Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a). Here, appellants did not plead constructive fraud.

15

vaguely[10] and without any limitation regarding the surface or mineral estate. He also misrepresented in 2010 that he and Isbell still held ownership of the property and were trying to sell it after he had transferred the remainder of the ownership of the surface tract of M & M to himself. The evidence thus shows that White failed to disclose the true nature of the Partnership's interest to his partner, either at the inception of the interest or during the dissolution of the Partnership, and he also affirmatively misrepresented the nature of that interest. Both the nondisclosure and misrepresentation facilitated White's ability to deposit funds from M & M into an account he controlled without any accountability to Davis.

White's own testimony about the nature of M & M's interest in the Crowley Tract conflicted: he agreed that he was not even thinking about minerals in 2003, but he nevertheless asserted that the Partnership receivable was for the surface estate only. As an attorney board certified in real estate law, White was aware of the effect of failing to reserve the mineral estate in the deed to M & M. It stands to reason that if M & M had not intended to own the mineral estate, White would have reserved the mineral estate in that deed. And although he likely prepared, or at the very least knew of the 2005 deed putting the mineral estate of the Crowley Tract into Lucky IW, he did not inform Davis at the time.

White did not tell Davis about the M & M receivables being paid into the escrow account and his personal account, about the backdated correction deeds,

---

[10]White said he told Davis "there was a piece of property that we would get paid out of."

or about any of the mineral activity that was occurring with respect to the Crowley Tract. This activity and the beginning of payments corresponds to the time the Partnership's receipts were down sixty to seventy percent. White gave conflicting testimony about the royalty money: he testified in his deposition that he did not pay any of it to Isbell, but he later testified at trial that the money went to Lucky IW, which at that time belonged wholly to Isbell. He had no proof to show payments to Lucky IW, however. When asked about the approximately $160,000 in royalties paid to M & M, Isbell stated, "It wasn't mine," and he did not think he was entitled to any of it.

White deposited money into the Partnership's real estate escrow account with the name M & M on the deposit slip, yet he did not keep track of what the money was for and later said it was Lucky IW's money. He did not document transactions related to M & M in the Partnership's escrow account, nor did he keep records of what may have been owed to Isbell or his entities, including Lucky IW or Deer Creek. Moreover, the evidence shows that White did not distribute to Davis his share of all payments to M & M related to the Crowley Tract's surface.[11]

---

[11]When asked about the $20,000 for the surface agreement, White then testified that the Partnership's interest extended only to "sales" of all or part of the Crowley Tract and not all transactions related to White's ownership, through M & M, of the surface. There is no evidence that White ever explained this distinction to Davis until after receiving money attributable to the mineral estate.

White's expert agreed that the March 2010 mineral interest assignment should not have included a general warranty of the mineral interests if M & M did not actually own them. He also agreed that White, as a thirty-five year attorney board certified in real estate, would have understood and appreciated the effect of the document.

The evidence thus shows that White failed to disclose the name of the entity holding the receivable, the structure of that entity, and the transactions affecting the structure and income stream of the receivable. He also misrepresented the ownership of the entity. Because of his position of trust in dealing with the real estate escrow account and monies owed by Isbell—and the dissolution of the Partnership—White was able to effectively keep this information from Davis, knowing that without this information, Davis would have a difficult time finding out the true nature of the deals between White and Isbell. Additionally, the evidence shows that White affirmatively represented to Davis that "nothing's going on" and that he and Isbell were having trouble selling the property when White was the sole owner of M & M at that time.

Accordingly, the evidence shows that White—by both misrepresentation and nondisclosure—was able to facilitate transactions in such a way that he not only could conceal them from his former partner but also prevent his former

partner from discovering what the Partnership was truly owed.[12]  We conclude

and hold that this evidence is sufficient under the clear and convincing standard

to uphold the jury's findings as to both reliance and causation.  *See Bazan v.*

*Muñoz*, 444 S.W.3d 110, 120 (Tex. App.—San Antonio 2014, no pet.); *Cooper v.*

*Cochran*, 288 S.W.3d 522, 532–33 (Tex. App.—Dallas 2009, no pet.) (op. on

reh'g).

**Evidence Not Mere Bad Faith**

Appellees argue that the above evidence amounts to nothing more than

bad faith and thus does not meet the requirements of section 41.003.  Bad faith

has been defined as the conscious doing of a wrong for a dishonest,

discriminatory, or malicious purpose.  *Bd. of Adjustment of City of Dallas v.*

*Billingsley Family Ltd. P'ship*, 442 S.W.3d 471, 477 (Tex. App.—Dallas 2013, no

pet.); *Robson v. Gilbreath*, 267 S.W.3d 401, 407 (Tex. App.—Austin 2008, pet.

denied); *see also City of Austin v. Whittington*, 384 S.W.3d 766, 786 (Tex. 2012)

(involving jury charge defining bad faith as requiring improper motive).  Bad faith

is not simply bad judgment or negligence.  *Falk & Mayfield L.L.P. v. Molzan*, 974

S.W.2d 821, 828 (Tex. App.—Houston [14th Dist.] 1998, pet. denied); *Elbaor v.*

*Sanderson*, 817 S.W.2d 826, 829 n.1 (Tex. App.—Fort Worth 1991, no writ).

---

[12]White himself testified that he did not know what happened to much of the money attributable to M & M or what payments purportedly to M & M were for.

As we have explained, the evidence supports the conclusion that White's initial structuring of M & M, the initial deed of the Crowley Tract to M & M, his failure to inform his partner—and affirmative misrepresentations to his partner—of the nature of M & M's ownership of the Crowley Tract, and his inability to account for the nature of payments to M & M show his specific intent to deprive Davis of money owed him from the former Partnership and to keep the bulk of the income generated from the former Partnership's asset for himself, without any accountability to Davis. *See Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 526 (Tex. 1998) (op. on reh'g) ("Proof that a defendant made a statement knowing of its falsity or without knowledge of its truth may be proved by direct or circumstantial evidence."); *JJJJ Walker, LLC v. Yollick*, No. 14-13-00161-CV, 2014 WL 4933040, at *7 (Tex. App.—Houston [14th Dist.] Sept. 25, 2014, no pet. h.) (op. on reh'g). Accordingly, we conclude and hold that the evidence is sufficient to support the jury's finding that the harm to Davis resulted from fraud such that the jury's award of exemplary damages was authorized by section 41.003. We overrule the three issues in appellees' cross-appeal.

**Propriety of Post-Trial Amendment to Apply Exemplary Damages Cap**

Appellants challenge the trial court's allowing appellees to amend their pleadings after the jury verdict to plead the cap on exemplary damages in section 41.008(a) of the civil practice and remedies code.

**Preservation**

Appellees contend that appellants failed to preserve their complaint about the application of the cap because they did not challenge every independent ground upon which the trial court could have limited the jury's exemplary damages award. Appellees list those grounds as follows:

- Subsection 41.008(b) caps punitive damages at two-times actual damages.

- An award of more than two-times actual damages would be excessive under state law principles.

- An award of more than two-times actual damages would violate federal constitutional principles.

But appellees did not raise these grounds in the trial court; instead, they relied solely on their arguments that (a) the cap applies whether pled or not or (b) they were entitled to a trial amendment to plead the cap as an affirmative defense. Because appellees did not seek limitation of the exemplary damages on either a federal or state excessiveness theory, the trial court could not have properly granted the reduction on those grounds. *Compare Britton v. Tex. Dep't of Crim. Justice*, 95 S.W.3d 676, 681 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (stating general rule that appellate court must affirm trial court judgment when appellant fails to "attack all independent bases or grounds that fully support a complained-of ruling or judgment"), *with* Tex. R. Civ. P. 301 (providing that judgment must conform to pleadings unless issues tried by express or implied

21

consent), Tex. R. Civ. P. 324(b)(4), *and Hawthorne v. Guenther*, 917 S.W.2d 924, 937 (Tex. App.—Beaumont 1996, writ denied) (requiring complaint about excessiveness of exemplary damages award to be raised at trial).[13]  Therefore, appellants did not have to challenge those grounds on appeal.

**Standard of Review**

A party may amend its pleadings at any time unless the amendment will operate as a surprise.  Tex. R. Civ. P. 63.  But a party must obtain leave of court to amend its pleading within seven days of trial or thereafter.  *Id.*  The trial court may not refuse an amendment unless the opposing party presents evidence of surprise or prejudice or unless the amendment on its face is calculated to surprise or "would reshape the cause of action, prejudicing the opposing party and unnecessarily delaying the trial."  *Greenhalgh v. Serv. Lloyds Ins. Co.*, 787 S.W.2d 938, 939–40 (Tex. 1990); *Dunnagan v. Watson*, 204 S.W.3d 30, 38 (Tex. App.—Fort Worth 2006, pet. denied).  This applies even to post-trial amendments.  *See generally Greenhalgh*, 787 S.W.2d at 939–40.  An amended pleading is not prejudicial as a matter of law merely because it asserts a new cause of action.  *Dunnagan*, 204 S.W.3d at 37–38; *Smith Detective Agency & Nightwatch Serv., Inc. v. Stanley Smith Sec., Inc.*, 938 S.W.2d 743, 749 (Tex.

---

[13] *See also Schexnayder v. Bonfiglio*, 167 Fed. App'x 364, 368 (5th Cir. 2006); *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 50 (Tex. 1998); *Riedell v. Hoffman Controls Corp.*, No. 05-00-00658-CV, 2001 WL 832342, at *2 (Tex. App.—Dallas July 25, 2001, no pet.) (not designated for publication).

App.—Dallas 1996, writ denied).  The burden of showing surprise or prejudice is on the party resisting the amendment.  *Greenhalgh*, 787 S.W.2d at 939.

Factors that courts have considered in determining whether a party has shown surprise sufficient to preclude a pleading amendment include (1) how long the suit had been on file before the amendment was filed, (2) how soon before trial the amendment was made, (3) whether the amendment presented a new claim or cause of action, (4) whether the new cause of action was based on recently discovered matters, and (5) whether the resisting party alleged surprise and that he was not prepared to try the new cause of action.  *Dunnagan*, 204 S.W.3d at 38–39; *Stevenson v. Koutzarov*, 795 S.W.2d 313, 321 (Tex. App.—Houston [1st Dist.] 1990, writ denied) (op. on reh'g).

**Applicable Law**

Appellees argued at trial, and they argue on appeal, that the cap in section 41.008 need not be pled at all and that the trial court must automatically apply the cap to any such award.  We disagree.  We have previously held in a case involving a cap under the labor code that "[a]s a general rule, where maximum damages are provided in statutes in Texas, and a defendant wants to rely on the cap, it is considered a defense that must be pleaded and proved."  *O'Dell v. Wright*, 320 S.W.3d 505, 515–16 (Tex. App.—Fort Worth 2010, pet. denied) (citing section 41.008 and *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 896–97, 904–05 (Tex. 2000), in which the supreme court held that a party's mistakenly pleading the wrong section number of the cap as an affirmative

23

defense did not preclude application of the section 41.008 cap).[14] Appellees challenge our holding in *O'Dell*, as well as our holding in the underlying *Auld* appeal, as dicta and argue instead that we should follow the Amarillo Court of Appeals's conclusion that the exemplary damages cap is not an affirmative defense that must be pled and proven at trial. *See THI of Tex. at Lubbock I, LLC v. Perea*, 329 S.W.3d 548, 588 (Tex. App.—Amarillo 2010, pet. denied).[15]

In *Auld*, we noted the nature of the application of the cap as a partial avoidance of the total exemplary damages that could be awarded; thus, we concluded that such a cap is in the nature of an affirmative defense. 985 S.W.2d at 233; *see* Tex. R. Civ. P. 94. In its opinion on direct appeal in *Auld*, the supreme court referred to the statutory cap on actual damages in the former version of the healthcare liability statute as an affirmative defense. 34 S.W.3d at 904; *cf.* Daniel B. Tukel, *The Best Defense or a Good Offense?  Are the Damage Caps in 42 U.S.C. § 1981A Waivable Affirmative Defenses?*, 24 Lab. Law. 303,

---

[14]*See also Marin v. IESI TX Corp.*, 317 S.W.3d 314, 332–33 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (op. on reh'g); *Wackenhut Corrections Corp. v. de la Rosa*, 305 S.W.3d 594, 651, 653 (Tex. App.—Corpus Christi 2009, no pet.); *Horizon/CMS Healthcare Corp. v. Auld*, 985 S.W.2d 216, 233 (Tex. App.—Fort Worth 1999) (op. on reh'g) ("A defendant who pleads the intent to rely at trial on a statutory cap of anticipated punitive damages is simply pleading a defensive theory by which the defendant will try to avoid a portion of the damages the plaintiff seeks."), *rev'd in part on other grounds*, 34 S.W.3d 887 (Tex. 2000).

[15]*See also Hall v. Diamond Shamrock Refining Co.*, 82 S.W.3d 5, 22–23 (Tex. App.—San Antonio 2001), *rev'd on other grounds*, 168 S.W.3d 164 (Tex. 2005) (op. on reh'g); *Seminole Pipeline Co. v. Broad Leaf Partners, Inc.*, 979 S.W.2d 730, 758–59 (Tex. App.—Houston [14th Dist.] 1998, no pet.).

311 (2009) ("Cases in which federal courts of appeal have found that a statutory damage cap is an affirmative defense that is waived if not timely asserted have two important elements in common: (1) The damage cap is found in a statute distinct from the authority on which the cause of action itself—whether statutory or common-law—was based and (2) the courts found that prejudice would result from allowing the late assertion of the statutory cap defense because it would prevent the plaintiff from having the opportunity to develop facts or present evidence that might mitigate or defeat the defense.").

We are not persuaded by appellees' arguments that practical concerns dictate a different result.[16] We are guided by our prior characterization in *Auld*—whether or not necessary to the ultimate outcome of that appeal—and our repetition of the same reasoning in *O'Dell*, that the application of the cap is tantamount to a plea in at least partial avoidance, which can be alternately defined as "[t]he act of evading or escaping," "refraining from," or "voidance." Black's Law Dictionary (9th ed. 2009). Our conclusion is also supported by the nature of the pleading of the cap, which would put a plaintiff on notice of the potential applicability of a capbuster, thus injecting a potential fact issue into the trial that may not be resolved by an appellate court. *See, e.g.*, *In re T.N.*, 180

---

[16]Likewise, appellees' reliance on other statutes and cases interpreting them is misplaced. *See In re Islamadora Fish Co. Tex., L.L.C.*, 319 S.W.3d 908, 912–13 (Tex. App.—Dallas 2010, orig. proceeding) (op. on reh'g) (determining applicability of section 41.005 of civil practice and remedies code need not be pled as affirmative defense when defendant pled general applicability of caps in section 41).

25

S.W.3d 376, 382–83 (Tex. App.—Amarillo 2005, no pet.) ("[T]he fact finder, as opposed to the reviewing body, enjoys the right to resolve credibility issues and conflicts within the evidence.").

The parties dispute the effect that appellees' failure to plead the cap before trial had on appellants' pleading and proof of exemplary damages in this case. Additionally, appellees attempt to cast appellants' alternative arguments for reversal as judicial admissions. *See Holy Cross Church of God in Christ v. Wolf*, 44 S.W.3d 562, 568 (Tex. 2001) ("Assertions of fact, *not [pled] in the alternative*, in the live pleadings of a party are regarded as formal judicial admissions." (emphasis added)). We are likewise not persuaded by these arguments. We recognize that there is a definite split of authority regarding whether statutory damages caps in general must be pled as affirmative defenses—in state and federal cases as well as in different statutory schemes. However, appellees' arguments and cited authority do not convince us to abandon this court's prior holdings.[17] Thus, we will review whether the trial court abused its discretion by allowing appellees to amend their pleadings post-trial to include the cap.

---

[17]Appellees also contend that the supreme court impliedly held that the cap is absolute, and not an affirmative defense, in *In re Columbia Med. Ctr. of Las Colinas*, 306 S.W.3d 246, 247–48 (Tex. 2010) (orig. proceeding), by vacating a trial court's new trial order, which it issued in the face of a supreme court opinion remanding for a new determination of punitive damages when the actual damages award had been reduced. The supreme court held, "[R]egardless of whether an appellate court judgment expressly commands it, trial courts must give effect to statutory caps on damages when the parties raise the issue." *Id.* at 248. We agree with the Corpus Christi Court of Appeals's opinion in *Zorrilla v. AYPCO Constr. II, LLC*, 421 S.W.3d 54, 68 (Tex. App.—Corpus Christi 2013,

26

**Analysis**

At the hearing regarding the applicability of the cap, the trial court appeared to be persuaded that the cap is not an affirmative defense and therefore that it was unnecessary for appellees to amend their pleadings. The trial judge asked the attorneys at the hearing if appellants would have an obligation to plead any applicable capbuster in their initial pleadings, regardless of whether appellees had pled the cap as an affirmative defense in their answer. Appellants' counsel argued that although he did not plead facts supporting the application of a capbuster listed in section 41.008(c), he would have pleaded and introduced proof of the applicability of penal code section 32.45 had he known that appellees intended to rely on the cap. Tex. Penal Code Ann. § 32.45 (West Supp. 2014). Instead, he asked only for exemplary damages within jurisdictional limits. Additionally, he would have asked for a jury instruction on the capbuster and tried to obtain a specific finding.

Although appellees contend that appellants pled the capbuster by alleging in their pleadings that White knowingly and intentionally misapplied fiduciary property, a fair reading of that pleading shows that appellants pled these facts in connection with their breach of fiduciary duty and fraud by nondisclosure claims

pet. filed), in which it held that *Columbia* did not overrule its prior opinion in *Wackenhut*, because it is unclear whether the parties raised the issue properly in *Columbia* by initially pleading the statutory cap as an affirmative defense. In the absence of a more clear pronouncement from the supreme court, we decline to rely on *Columbia* to hold that the cap is not an affirmative defense; likewise, the result in this case is dictated by appellees' failure to timely plead the cap.

27

and, thus, that they did not anticipate the defensive cap in their own pleadings. *But cf. Phillips v. Phillips*, 820 S.W.2d 785, 789 (Tex. 1991) (holding that defendant may rely on plaintiff's anticipatory pleading in response to unpled defensive matters). Although the exemplary damages are based on appellants' fraud claims, they do not link the knowing and intentional misapplication of property allegations to their claim for exemplary damages such that a reliance on penal code section 32.45 as a capbuster is evident:

> White's conduct as set forth above was intentional in that White intended to gain an additional and unwarranted benefit above and beyond that of his partner Davis. Additionally, because White knew his representations were false at the time they were made, the representations were fraudulent and malicious and constitute conduct for which the law warrants the imposition of exemplary damages. Accordingly, Plaintiffs sue for exemplary damages in a sum within the jurisdictional limits of this court.

*See Boyles v. Kerr*, 855 S.W.2d 593, 601 (Tex. 1993) (op. on reh'g).

We conclude and hold that appellants showed that they were surprised and prejudiced by appellees' failure to plead the cap before trial in that appellants would and could have pled and introduced proof of a capbuster. Appellees contend that even so, the trial court nevertheless had discretion to grant the amendment. *See State Bar of Tex. v. Kilpatrick*, 874 S.W.2d 656, 658 (Tex.) ("If the trial amendment is not mandatory, then the decision to permit or deny the amendment rests within the sound discretion of the trial court."), *cert. denied*, 512 U.S. 1236 (1994). But after making this statement in *Kilpatrick*, the supreme court went on to analyze whether there was a showing of surprise or prejudice,

28

finding none.  *Id.* at 658–59.  Here, appellants have shown that appellees' failure to plead the cap prejudiced their pleading and proof of a capbuster.

We conclude and hold that the trial court abused its discretion by granting the trial amendment in the face of evidence of surprise and prejudice to appellants.  We sustain appellants' sole issue on appeal.

**Ethical Concerns Raised By Evidence**

Although neither party has raised the troubling ethical concerns inherent in this appeal—and we do not consider them for purposes of the resolution of the liability issues as indicated in the Preamble to the Disciplinary Rules of Professional Conduct—we nevertheless are duty-bound to address and report potential ethical violations when they come to our attention.  *See* Tex. Disciplinary Rules Prof'l Conduct preamble ¶ 15, *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G, app. A (West 2013) (Tex. State Bar R. art. X, § 9).  Below, we list the following parts of the Disciplinary Rules of Professional Conduct that the evidence potentially implicates in this case:

- "A consequent obligation of lawyers is to maintain the highest standards of ethical conduct."  Tex. Disciplinary Rules Prof'l Conduct preamble ¶ 1.

- "A lawyer's conduct should conform to the requirements of the law, both in professional service to clients and in the lawyer's business and personal affairs."  Tex. Disciplinary Rules Prof'l Conduct preamble ¶ 4.

29

- "A lawyer shall not assist or counsel a client to engage in conduct that the lawyer knows is criminal or fraudulent." Tex. Disciplinary Rules Prof'l Conduct R. 1.02(c) & cmt ¶ 7.

- "When a lawyer has confidential information clearly establishing that a client is likely to commit a criminal or fraudulent act that is likely to result in substantial injury to the financial interests or property of another, the lawyer shall promptly make reasonable efforts under the circumstances to dissuade the client from committing the crime or fraud."[18] Tex. Disciplinary Rules Prof'l Conduct R. 1.02(d).

- "When a lawyer has confidential information clearly establishing that the lawyer's client has committed a criminal or fraudulent act in the commission of which the lawyer's services have been used, the lawyer shall make reasonable efforts under the circumstances to persuade the client to take corrective action." Tex. Disciplinary Rules Prof'l Conduct R. 1.02(e).

- "A lawyer shall not prepare an instrument giving the lawyer or a person related to the lawyer as a parent, child, sibling, or spouse any substantial gift from a client, including a testamentary gift, except where the client is

---

[18]"Debtors in a bankruptcy action have an absolute duty to report whatever interests they hold in property, even if they believe the asset is worthless or unavailable to the bankruptcy estate." *Stewart v. Hardie*, 978 S.W.2d 203, 208 (Tex. App.—Fort Worth 1998, pet. denied) (op. on reh'g) (citing *In re Yonikus*, 974 F.2d 901, 904 (7th Cir. 1992)).

related to the donee" except for "standard commercial transactions between the lawyer and the client for products or services that the client generally markets to others." Tex. Disciplinary Rules Prof'l Conduct R. 1.08(b), (j).

- "In the course of representing a client a lawyer shall not knowingly: (a) make a false statement of material fact or law to a third person . . . ." Tex. Disciplinary Rules Prof'l Conduct R. 4.01(a).

- "A lawyer shall not . . . (1) violate these rules . . . ; [or] (3) engage in conduct involving dishonesty, fraud, deceit or misrepresentation." Tex. Disciplinary Rules Prof'l Conduct R. 8.04(a)(1), (3).

Having identified potential violations of the above rules, we are compelled to report them by forwarding a copy of this opinion and the appellate record to the Texas State Bar's Chief Disciplinary Counsel's Office.

## Conclusion

Having sustained appellants' issue on appeal, and having overruled appellees' issues in their cross-appeal, we reverse the trial court's award of exemplary damages and render judgment on the jury's verdict that appellants recover from appellees $2.8 million in exemplary damages. We affirm the remainder of the trial court's judgment.[19]

/s/ Terrie Livingston

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL: LIVINGSTON, C.J.; MCCOY and MEIER, JJ.

DELIVERED: December 29, 2014

---

[19]Although appellants pled for a constructive trust on M & M as an alternative to their request for the entire exemplary damages amount, appellees have not asked this court for any relief regarding the constructive trust, dependent on the outcome of the appeal.